1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10    SECURITIES AND EXCHANGE                    CASE NO. C09-1292
      COMMISSION,

11                                               ORDER DENYING SUMMARY
                              Plaintiff,         JUDGMENT

12
                 v.
13
      STUART W. FUHLENDORF,
14
                              Defendant.
15

16

17         This comes before the Court on Defendant's motion for summary judgment. (Dkt. No.

18    142.)  Having reviewed the motion, the response (Dkt. No. 155), the reply (Dkt. No.  164), the

      notice of newly reported case authority (Dkt. No. 161), Defendant's surreply (Dkt. No. 169), and
19
      all related filings, the Court DENIES Defendant's motion for summary judgment, DENIES
20
      Defendant's request to strike Deposition Exhibit 666, GRANTS Defendant's request to strike
21
      SEC's improper surreply filed as Dkt. No. 167, and GRANTS Plaintiff's request to strike
22
      portions of Robb's Declaration in support of summary judgment.
23
      \\
24

ORDER DENYING SUMMARY JUDGMENT- 1

1 **Background**

2     Defendant Stuart W. Fuhlendorf ("Fuhlendorf") is the former Chief Financial Officer

3 ("CFO") of Isilon Systems, Inc. ("Isilon").  (Fuhlendorf Decl., Dkt. No. 143 at 2.)  Isilon sells

4 data storage systems for unstructured, file-based data.  In December 2006, Fuhlendorf was the

5 CFO as Isilon went through an initial public offering.  (Id.)  The Securities and Exchange

6 Commission ("SEC") alleges Fuhlendorf knew that Isilon would not meet analysts' revenue

7 forecasts and, thus, pursued a number of transactions to inflate Isilon's reported revenue.

8 (Compl. ¶¶ 1-5.)

9     The SEC alleges Isilon recognized revenue for purchase orders subject to contingencies

10 in its first three quarters as a public company and Fuhlendorf violated the Securities Act of 1933

11 ("Securities Act") and the Securities and Exchange Act of 1934 ("the Exchange Act") in his

12 capacity as CFO.  Specifically, the SEC contends Fuhlendorf improperly recognized revenue

13 with respect to five transactions in the fourth quarter of 2006 ("Q4 2006"), the first quarter of

14 2007 ("Q1 2007"), and the second quarter of 2007 ("Q2 2007").

15 A.  CDI Transaction in Q4 2006

16     The SEC contends Fuhlendorf knew of an oral side agreement with Computer Design &

17 Integration, LLC ('CDI') whereby CDI could delay payment until CDI received an order from

18 its end-user.  (Compl. ¶¶ 14-21.)  The SEC alleges Fuhlendorf violated Generally Accepted

19 Accounting Principles ("GAAP") when he nevertheless recognized revenue from the CDI

20 purchase order.  (Id.)

21     In summer of 2006, the Chief Financial Officer ("CFO") of CDI expressed to Fuhlendorf

22 that CDI did not want to maintain Isilon product in its inventory if its end-user decided not to

23 complete an order.  (Brooks Decl., Dkt. No. 157, Ex. P at 75:5-20.)  Fuhlendorf spoke with

24

ORDER DENYING SUMMARY JUDGMENT- 2

1    CDI's CFO and suggested Isilon's warranty provision for defective products could be used to

2    return any unsold product.  (Id. at 137:15-138:22; see also Brooks Decl., Dkt. No. 158, Ex. 161).

3    With those assurances, CDI agreed to purchase Isilon "net 60 from shipment from CDI" (i.e.,

4    CDI could pay Isilon sixty days after the produce shipped).  (Id. at Ex. 176).

5           With the summer 2006 transaction as context, a conference call was held with Isilon and

6    CDI in mid-December 2006 to finalize details regarding another CDI purchase order at the end

7    of 2006.  (Brooks Decl., Dkt. No. 157, Ex. A at 58:19-60:14.) The conference call included

8    Goldman from Isilon, and the CEO and CFO of CDI.  During the SEC's initial investigation,

9    CDI's CEO testified that Fuhlendorf participated on the call but CDI's CEO was unable to verify

10   that recollection at his deposition.  (Id., Dkt. No. 158, Ex. 39 at 63:22-25.)

11          It remains disputed as to whether an oral side agreement was made during the conference

12   call whereby CDI could return Isilon product if an order did not come through from the end-user,

13   Comcast.  (Compare Robbs Decl., Ex. 40, 180:21-22 (Goldman Deposition) with Brooks Decl.,

14   Dkt. No. 157, Ex. A, 74:2-77:21, 105:1-11 (Bakker Deposition)).  However, at the least, CDI's

15   CEO made it clear during the conference call that CDI would not pay Isilon until the end-user

16   paid CDI.  (Robbs Decl., Ex. 39 at 56:18-59:12).

17          On December 20, 2006, CDI submitted a purchase order to Isilon on behalf of its end-

18   user Comcast.  (Robbs Decl., Dkt. No. 144, Ex. 33.)  While Isilon accounted for the CDI

19   transaction by recognizing $879,235 in revenue for the fourth quarter of 2006, Comcast

20   ultimately did not complete the order.  CDI declined to pay Isilon, asserting an oral side

21   agreement existed with Isilon excusing CDI from payment.  (Id. at Ex. 39, 56:1-59:25.)

22          The revenue recognized by CDI's December 2006 purchase order represented 4.07

23   percent of Isilon's quarterly revenue.  (Brooks Decl., Dkt. No. 158, Ex. 276 at 3).

24

ORDER DENYING SUMMARY JUDGMENT- 3

B.  Talon Transaction (First Quarter of 2007)

The SEC contends Fuhlendorf made an oral side agreement with Talon Data Systems, Inc. ("Talon") whereby Talon could delay payment until it received an order from its end-user. (Compl. ¶¶ 27-28.)  The SEC alleges Isilon violated GAAP when it recognized the Talon purchase order as revenue because the order was contingent on Talon finding an end-user for Isilon's product.  (Id.)

On March 30, 2007, Talon submitted a purchase order to Isilon with the goal of re-selling the product to end-user Technicolor.  (Robbs Decl., Ex. 49.)  Prior to the sale, Isilon's sales representatives knew Talon did not have a purchase order from Technicolor and would not place an order unless Isilon agreed to help Talon find new customers.  (Brooks Decl., Dkt. No. 157, Ex. T at 35:4-36:19.)  Isilon's sales representatives therefore offered to provide Talon 89-day payment terms to allow Talon time to find an alternative end-user.  (Id. at 38:7-40:7.)

Before submitting the order, Talon's president believes it was "more probable than not" that he also spoke with Fuhlendorf.  (Id. at 44:14.)  Although he did not have specific memory of the conversation, he stated, "I wouldn't have extended myself out for this kind of money.  There is no way in the world that [with] this large [of] a purchase order from me, knowing that I had no [Technicolor] POs that I would have just taken [a sales representative's] word that they will find a home for this kind of stuff."  (Id. at 43:22-45:25.)

Fuhlendorf does not remember having a conversation with Talon's president in March 2007.  (Robbs Decl., Ex. 50.)  Fuhlendorf believes he spoke with Talon's president for the first time in June 2007 when he sought to solicit another order from Talon.  (Id.)  In preparation for the June 2007 phone call, Isilon's sales representative emailed Fuhlendorf background

1   information about Talon, Talon's president, and the companies' relationship, apparently

2   believing Fuhlendorf had not spoken to Talon's president in the past.  (Robbs Decl., Ex. 52.)

3          Even though contingent, Isilon accounted for the Talon transaction by recognizing

4   approximately $600,000 in revenue for the first quarter of 2007.  (Brooks Decl., Dkt. No. 158,

5   Ex. 276 at 3).  The revenue represented 2.81 percent of Isilon's quarterly revenue.  (Brooks

6   Decl., Dkt. No. 158, Ex. 276 at 3.)

7   C.   Intelligentias Transaction (Q1 2007)

8          The SEC alleges Fuhlendorf was personally involved in "a round-trip transaction" with

9   Intelligentias, Inc. ("Intelligentias") for which there was no economic substance." (Compl. ¶ 35.)

10  As a result, the SEC contends Isilon improperly recognized revenue and made misleading

11  statements in the company's 8-K and 10-Q filings.  (Id. at ¶¶ 37-38).

12         Intelligentias is a publicly-traded U.S. technology company based in Italy.  On February

13  19, 2007, Intelligentias submitted an order for $2.8 million to Isilon that was contingent on

14  receiving authorization from the Italian government.  (Brooks Decl., Ex. 158, Ex. 564.)  By late-

15  March 2007, however, the Italian government had still not authorized the purchase.  (Brooks

16  Decl., Ex. C, 115:22-117:14.)

17         On March 29, 2007, Intelligentias's president offered to lift the contingency if Isilon

18  agreed to purchase Intelligentias product.  (Id. at 217:10-25.)  Two conference calls between

19  Isilon and Intelligentias executives were set up the next day, both of which Fuhlendorf

20  participated.  (Robbs Decl., Ex. 70 at 124:17-22; Ex. 71, 216:9-218:25.)  As a result of the calls,

21  Isilon agreed to purchase Intelligentias software and Intelligentias agreed to waive the

22  contingency.  (Robbs Decl., Ex. 74.)

23

24

1        Based on the March 30, 2007 agreement, Intelligentias agreed to the shipment of $2.2

2    million of Isilon product originally purchased in February and Isilon agreed to purchase $2.2

3    million of Intelligentias software at a forty percent discount (for a purchase price of $1.32

4    million).  (Robbs Decl., Ex. 75.)  Although Intelligentias appears to have sought a strategic

5    partnership with Isilon from early 2007, (Robbs Decl., Ex. 58 at 48:7-49:3), this was the first

6    time Isilon executives considered purchasing Intelligentias software. (Brooks Decl., Ex. C at

7    217:10-25.)  In addition to the initial software purchase, Isilon was given the option to purchase

8    $1.7 million more at the same discounted rate by June 30, 2007. (Robbs Decl., Ex. 74.)  For

9    Intelligentias's part, Intelligentias was permitted to pay in two installments—the first being $1

10   million and the second being $1.2 million at a later date.  The payment date for the first

11   installment was scheduled after Isilon's payment date and the payment date for the second

12   installment was after Isilon's payment date if Isilon exercised its option.  (Brooks Decl., Ex. 45.)

13       The March 30, 2007 agreement occurred before Isilon's sales team completed any sales

14   or marketing analysis regarding the software.  (Brooks Decl., Ex. R, 355:13-20, 357:6-15.)  In

15   addition, Fuhlendorf does not recall reviewing financial forecasts for Intelligentias software prior

16   to the agreement.  (Brooks Decl., Ex. G, 227-12-25, 230:18-232:1.)  No formal purchase order

17   was submitted for Intelligentias's software; however, Fuhlendorf wrote Intelligentias a check for

18   $1.32 million on May 21, 2007 and personally delivered it to Intelligentias's CEO at a meeting.

19   (Brooks Decl., Ex. G, 257:12-17; Id. at 227-12-25, 230:18-232:1.) Ultimately, Isilon did not re-

20   sell Intelligentias's software and did not exercise its option to purchase more software.  (Robbs

21   Decl., Ex. 100, 197:7-199:13.)  In October 2007, Isilon had still not received Intelligentias's

22   software.  (Brooks Decl., Dkt. No. 158, Ex. 644.)

23

24

1    In analyzing the agreement, the head of Isilon's accounting department and an outside

2    auditor, PriceWaterhouseCoopers, concluded Isilon could recognize revenue from its sale to

3    Intelligentias in Q1 2007. (Robbs Decl., Ex. 79, 84, 85.)  Isilon recognized $1.962 million in

4    revenue on its Intelligentias transaction, which represented 9.08 percent of Isilon's quarterly

5    revenues.  (Brooks Decl., Dkt. No. 158, Ex. 276 at 3.)

6    D.  DailyMotion Transaction (Q2 2007)

7    The SEC alleges Fuhlendorf improperly reported $780,000 in revenue from a transaction

8    with Dailymotion that was not yet final and Fuhlendorf made materially false statements when

9    he endorsed this revenue recognition in subsequent 8-K and 10-Q filings.  (Compl. ¶¶ 46-47.)

10   In February 2007, Dailymotion submitted a purchase order to Isilon for its next-

11   generation product 9000 series units.  (Robbs Decl., Ex. 115.)  But, in June 2007, Dailymotion

12   informed Isilon's sales represenative that (1) it would not accept shipment of the 9000 series

13   units without approval from its Board of Directors and (2) it was considering competitors'

14   products because of technical problems with Isilon's products. (Brooks Decl., Dkt. No. 157, Ex.

15   K, 51:3-55:4; see also Ex. M. 41:25-42:19.) Isilon's sales representative passed both concerns

16   onto Fuhlendorf.  (Id. at Ex. M., 41:25-42:19.)

17   On June 27, 2007, Fuhlendorf contacted Dailymotion's CFO to discuss both companies'

18   financing issues. (Robbs Decl., Ex. 121 at 301:6-302:5.)  Four days later, on the last day of

19   Isilon's second quarter, Isilon shipped the 9000 series units to Dailymotion, plus three nodes free

20   as compensation for technical problems, and sent Dailymotion an invoice.  (Robbs Decl., Ex.

21   123-125.)  While Isilon's sales representative believed the transaction complete, Dailymotion's

22   Board of Directors had not yet met to approve the purchase.

23

24

ORDER DENYING SUMMARY JUDGMENT- 7

1    During the first week in July, when Dailymotion's Board of Directors convened,

2   Dailymotion's CFO informed Isilon that a competitor was offering a lower price and requested

3   Isilon match it.  (Robbs Decl., Ex. 126.)  Isilon's sales representatives, however, did not change

4   the dollar amount of the February 2007 order.  Instead, upon approval from management, the

5   sales representative agreed to send additional shipments of Isilon storage units to match the

6   competitor's value.  (Brooks Decl., Ex. K at 57:20-58:25.)  While Fuhlendorf did not negotiate

7   the additional shipment or sign off on it, Dailymotion's CFO sent an email on July 5, 2007,

8   memorializing the final agreement to which Fuhlendorf was copied.  (Robbs Decl., Ex. 132.)

9   Fuhlendorf appears not to remember reading the email. (Robbs Decl., Ex. 138 at 316:13-20.)

10    Isilon recognized approximately $780,000 in revenue on the Dailymotion transaction,

11   which represented 3.11 percent of quarterly revenues. (Brooks Decl., Dkt. No. 158, Ex. 276 at 3.)

12   E.  CMP Transaction (Q1 2007)

13    The SEC alleges Fuhlendorf improperly reported approximately $453,000 in revenue

14   from a transaction with Creative Media Partners Inc. ("CMP").  The factual background of the

15   transaction is not provided because Fuhlendorf only contests the materiality of the CMP

16   transaction and not scienter.  The CMP transaction represented 2.1 percent of Isilon's first

17   quarter revenues.

18   **Analysis**

19   A.  Motion for Summary Judgment

20    The SEC alleges the following claims:  (1) fraud in the purchase or sale of securities in

21   violation of Exchange Act § 10(b) and Rule 10b-5; (2) fraud in connection with the offer or sale

22   of securities in violation of Securities Act § 17 (a)(1); (3) fraud in connection with the offer or

23   sale of securities in violation of Securities Act §§ 17 (a)(2) and 17(a)(3); (4) fraud in the filing of

24

annual and quarterly reports in violation of Exchange Act § 13(a) of the and Rules 12b-20, 13a-1, 13a-11, and 13a-13; (5) improper record keeping in violation of Exchange Act § 13(b)(2)(A); (6) failure to maintain internal accounting controls in violation of Exchange Act § 13(b)(2)(B); (7) record keeping in violation of Exchange Act § 13(b)(5); (8) improper record keeping in violation of Rule 13b2-1 under the Exchange Act; (9) providing false certifications in violation of Rule 13a-14 under the Exchange Act; and (10) making false or misleading statements or omissions n connection with an audit in violation of Rule 13b2-2 under the Exchange Act. (Compl. ¶¶ 51-85.)

Defendant seeks summary judgment of all ten claims.[1] Defendant argues summary judgment is appropriate because the SEC has failed to show Fuhlendorf knew four of the five transactions (CDI, Talon, Intelligentias, and DailyMotion) were subject to contingencies and, therefore, the SEC has failed to show the requisite mental state for liability. In addition, Fuhlendorf argues four of the five the transactions (CDI, Talon, DailyMotion, and CMP) were immaterial. The Court finds a dispute of material fact exists as to Fuhlendorf's scienter and/or materiality, precluding summary judgment with respect to all of the transactions.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there are no genuine issues of material fact for trial and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Material facts are those "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The underlying facts are viewed in the light most favorable to the party opposing the motion.

---

[1] Fuhendorf's motion for summary judgment was filed, the SEC voluntarily dismissed claims (2), (4), (5), and (6), related to aiding and abeting. (Dkt. No. 179.)

1  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The party moving

2  for summary judgment has the burden to show initially the absence of a genuine issue

3  concerning any material fact.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970).  Once the

4  moving party has met its initial burden, the burden shifts to the nonmoving party to establish the

5  existence of an issue of fact regarding an element essential to that party's case, and on which that

6  party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24

7  (1986).

8      1.  First and Second Claims – Primary Liability

9          The SEC voluntarily dismissed its second claim for primary liability under § 17(a)(1) of

10  the Securities Act.  (Dkt. No. 179.)  The Court, therefore, considers Fuhlendorf's motion for

11  summary judgment only with respect to the first claim under Exchange Act §10(b) and Rule 10b-

12  5, which require a showing that the defendant made '(1) a material misstatement or omission, (2)

13  in connection with the offer or sale of a security, (3) by means of interstate commerce'"  SEC v.

14  Phan, 500 F.3d 895, 907-08 (9th Cir. 2007).

15      a.  Scienter

16          Defendant argues the SEC cannot demonstrate Defendant had the requisite scienter with

17  respect to four of the five transactions at issue (i.e., all transactions except CMP).  The Court

18  disagrees.

19          To be held liable under § 10(b) and Rule 10b-5, a defendant must have acted with

20  scienter, which is defined as a "mental state embracing intent to deceive, manipulate or defraud."

21  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  Scienter may be established by

22  showing reckless conduct.  See Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th

23  Cir. 1990).  In other words, scienter may be shown if "defendants knew their statements were

24

1  false, or by showing that defendants were reckless as to the truth or falsity of their statements."

2  Gebhart v. SEC, 595 F.3d 1034, 1040 (9th Cir. 2010).  "Summary judgment is generally

3  inappropriate when mental state is an issue, unless no reasonable inference supports the adverse

4  party's claim."  Vucinich v. Paine, Webber, Jackson & Curtis, Inc., 739 F.2d 1434, 1436 (9th

5  Cir. 1984).  Here, a dispute exists as to whether Fuhlendorf knew that the transactions were

6  subject to contingencies and, therefore, acted with scienter when recognizing the transactions as

7  revenue.

8        i.     CDI

9        There is evidence that Fuhlendorf was aware the CDI purchase order was subject to

10  contingencies and therefore improperly recognized as revenue.  In December 2006, Fuhlendorf

11  knew CDI did not have a commitment from its end-user and, based on earlier dealings with CDI,

12  he knew CDI preferred not to pay Isilon until an end-user was secured.  (Brooks Decl., Ex. I,

13  266:7-267:5.)  In addition, CDI's CEO testified that Fuhlendorf participated in the December

14  2006 conference call where the alleged oral side agreement to CDI was made.[2]  While the SEC

15  still bears the burden of proving scienter at trial, this is sufficient showing of a factual dispute as

16  to whether Fuhelndorf acted recklessly and precludes summary judgment based on scienter.

17        ii.    Talon

18        There is evidence that Fuhlendorf knew the Talon purchase order was also subject to

19  contingencies.  While he does not remember all of the details, Talon's CEO believes it is "more

20  probable than not" that he spoke with Fuhlendorf who signed off on the oral side agreement.

21  _____

22  [2] While CDI's CEO could not remember Fuhlendorf's presence during a later deposition, the
     Court may consider sworn statements taken in the course of SEC investigations as the equivalent

23  of affidavits and admissible for summary judgment purposes.  See, e.g., SEC v. American
     Commodity Exch., Inc., 546 F.2d 1361, 1369 (10th Cir. 1976); SEC v. Lucent Technologies,

24  Inc., 610 F.Supp.2d 342, 365 n.11 (D.N.J. 2009).

1   (Brooks Decl., Dkt. No. 157, Ex. T at 44:14.)  While Fuhlendorf argues he did not speak to

2   Talon's CEO until several months after the transaction occurred, the Court finds the discrepancy

3   between Fuhlendorf and the Talon CEO's memories sufficient to raise a genuine issue of

4   material fact.  Since a reasonable jury could decide Fuhlendorf knew the Talon transaction was

5   subject to contingencies and acted with scienter when he recognized Talon's purchase order as

6   revenue, the Court finds a factual dispute exists as to scienter.

7           iii.    <u>Intelligentias</u>

8           A genuine issue of material fact exists as to Fuhlendorf's mental state during the

9   Intelligentias transaction.  Fuhlendorf personally negotiated the deal with Intelligentias and it

10  appears he structured the deal to be "cash flow neutral."  (Brooks Decl., Ex. R at 328:21-329:3

11  and Ex. 663 at 137089.)  While Fuhlendorf argues "cash flow neutral" refers only to a part of the

12  transaction, there is a dispute as to whether Isilon's purchase of Intelligentias's software was a

13  bona fide deal or intrinsically related to Intelligentias's agreement to accept Isilon's shipment.

14  Specifically, there is evidence that Intelligentias did not have the cash to purchase Isilon product.

15  (<u>See</u> Brooks Decl., Ex. D at 56:10-57:14.)  In addition, there is evidence that Isilon's decision to

16  purchase Intelligentias's software may have been made in haste and without due diligence by

17  Isilon's sales team.  While Fuhlendorf argues hindsight review of Isilon's business decisions is

18  inappropriate, the efficacy of Isilon's business deals is not at issue.  A jury may find the above to

19  be circumstantial evidence that the Intelligentias transaction was entered into to ensure

20  Intelligentias's purchase of Isilon product.  Since a factual dispute remains, the Court declines to

21  grant summary judgment.

22  \\

23  \\

24

1          iv.   <u>DailyMotion</u>

2          A genuine issue of material fact exists as to whether Fuhlendorf knew the DailyMotion

3   purchase order was not final and improperly recognized as revenue in Q1 2007.  An Isilon sales

4   representative told Fuhlendorf that DailyMotion's transaction required a vote by DailyMotion's

5   board of directors, who would not be meeting until after Isilon completed its second quarter.

6   (Brooks Decl., Dkt. No. 157, Ex. M., 41:25-42:19.)  In addition, five days after the end of

7   Isilon's second quarter, Fuhlendorf was copied on an email from Dailymotion which contained

8   the final terms of the purchase order. (Brooks Decl., Dkt. No. 158, Ex. 319.)  The email stated,

9   "Please consider this [ ] an official commitment from Dailymotion to receive your shipment

10  under these terms." (<u>Id.</u>)  While Fuhlendorf argues the Isilon sales representative's memory is

11  shaky and that there is no proof Fuhlendorf read the July 5, 2007 email, the Court finds

12  Fuhlendorf's arguments merely demonstrate a genuine issue of material fact.

13         The Court finds Fuhlendorf's scienter remains in dispute, precluding summary judgment

14  on the SEC's claims under §10(b) and Rule 10b-5.

15         v.   <u>Materiality</u>

16         Defendant also seeks summary judgment on the grounds that four of the five transactions

17  (i.e., all transactions except Intelligentias) are immaterial.

18         Violations of § 10(b) and Rule 10b-5 require a misstatement of <u>material</u> fact.  17 C.F.R.

19  §240.10b-5(b). For purposes of securities fraud, "materiality depends on the significance the

20  reasonable investor would place on the withheld or misrepresented information."  <u>Basic Inc. v.</u>

21  <u>Levinson</u>, 485 U.S. 224, 240 (1988).  To fulfill the materiality requirement, "there must be a

22  substantial likelihood that the disclosure of the omitted fact would have been viewed by the

23  reasonable investor as having significantly altered the 'total mix' of information made

24

1   available." <u>Basic Inc.</u> 485 U.S. at 231-32.  In other words, a statement is material if "a reasonable

2   investor would have considered it useful or significant." <u>United States v. Smith</u>, 155 F.3d 1051,

3   1064 (9th Cir. 1998).  Since the issue of materiality is a mixed question of law and fact,

4   determining materiality in securities fraud cases is ordinarily left to the trier of fact.  <u>SEC v.</u>

5   <u>Phan</u>, 500 F.3d 895, 908 (9th Cir. 2007).

6          Under the SEC's internal guidance on materiality, a misstatement under five percent may

7   be used as an initial step in assessing materiality.  SEC Staff Accounting Bulletin No. 99 ("SAB

8   No. 99"); <u>see also</u> <u>Ganino v. Citizens Util. Co.</u>, 228 F.3d 154, 163 (2d Cir. 2000)(recognizing

9   SAB No. 99 as persuasive authority).  But, "quantifying, in percentage terms, the magnitude of a

10  misstatement is only the beginning of an analysis of materiality." SAB No. 99; <u>see also</u> <u>Teamster</u>

11  <u>Joint Council Pension Trust Fund v. America West Holding Corp.</u>, 320 F.3d 920, 934 (9th Cir.

12  2003)(rejecting defendant's proposal of a bright line rule regarding materiality).  Qualitative

13  factors may render material a quantitatively small misstatement.  <u>See</u> SAB No. 99; <u>see also</u> <u>ECA</u>

14  <u>& Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.</u>, 553 F.3d 187, 204 (2nd Cir.

15  2009)(assessing qualitative factors when applying the materiality framework set forth in SAB

16  No. 99).

17         Here, Defendant contends the values of four of the five transactions are immaterial

18  because they did not exceed five percent of Isilon's respective quarterly revenues and no

19  qualitative factor suggests materiality.  The Court disagrees.  With respect to the Talon and CMP

20  transactions, which respectively represent 2.8 and 2.1 percent of Q1 2007 revenues, the

21  transactions are likely material when aggregated with the Intelligentias transaction even if

22  quantitatively small transactions on their own.  The Intelligentias transaction was also entered

23  into during Q1 2007 and represented 9.08 percent of Isilon's quarterly revenue.  (<u>See</u> Brooks

24

1   Decl., Ex. 276 at 3.)  As stated in SAB No. 99, "even though a misstatement of an individual

2   amount may not cause the financial statements taken as a whole to be materially misstated, it

3   may, when aggregated with other misstatements, render the financial statements taken as a whole

4   to be materially misleading." SAB No. 99.

5            With respect to the CDI and DailyMotion transactions, the Court also finds a dispute as to

6   materiality.  As the Ninth Circuit held, there is no bright-line rule regarding materiality.  See, e.g.,

7   U.S. v. Jenkins, 2011 WL 208357 (9th Cir. Jan. 25, 2011)(finding posts on an internet message

8   board material because defendants closely monitored the board).   While they represented less

9   than five percent of quarterly revenue, respectively, the transactions accounted for more than

10  $800,000 in revenue each.  A jury may agree with Fuhlendorf's own statement in a letter to

11  Isilon's auditor on March 14, 2007, that "items are … material, either individually or in the

12  aggregate, if they exceed $600,000 of impact to the consolidated statements of operations or

13  consolidated balance sheet." (Brooks Decl., Ex. 691.)  In addition, the Morgan Stanley analyst's

14  reliance on Isilon's quarterly revenues when issuing investor reports could render the

15  quantitatively small transactions material.  (See Brooks Decl., Ex. 849, 850, 853-55.)   While

16  Fuhlendorf argues Isilon would have missed its targets regardless if the CDI and DailyMotion

17  transactions were included, a jury may find the extent or degree to which a company misses

18  targets material.

19           Since a genuine issue of material fact exists, the Court DENIES Defendant's motion for

20  summary judgment.

21    2.   Third Claim

22           Violations of §§ 17(a)(2)-(3) require a showing that the defendant made '(1) a material

23  misstatement or omission, (2) in connection with the offer or sale of a security, (3) by means of

24

1  interstate commerce'"  <u>SEC v. Phan</u>, 500 F.3d 895, 907-08 (9th Cir. 2007).  However, unlike

2  Exchange Act § 10(b), violations of §§17(a)(2)-(3) only requires a showing of negligence.  <u>SEC</u>

3  <u>v. Phan</u>, 500 F.3d at 907-8.

4       This is essentially the same claim as §10(b) and Rule 10b-5 but without the scienter

5  requirement.  Given that a genuine issue of material fact exists even with respect to claims

6  requiring scienter, the §§17(a)(2)-(3) claims, which require only negligence, likewise survive.

7  The Court DENIES Fuhlendorf's motion for summary judgment as to the SEC's third claim.

8       3.  <u>Fourth Claim, Fifth, and Sixth Liability – Aiding and abetting</u>

9       The SEC's fourth, fifth, and sixth claims under §13(a)-(b) of the Exchange Act render a

10  defendant liable for aiding and abetting another in misreporting financial statements.  The Court

11  has already dismissed these claims after the SEC's February 24, 2011 notice of authority to

12  dismiss.  (<u>See</u> Dkt. No. 179).

13       4.  <u>Seventh and Eighth Claims – Books and Records Claims</u>

14       The SEC's seventh and eighth claims under § 13(b)(5) and Rule 13b2-1 of the Exchange

15  Act require a showing that a defendant circumvented internal controls and caused the

16  falsification of financial records.  A finding of materiality is not required for either claim.  <u>See</u>

17  <u>U.S. v. Nichols</u>, 2008 WL 5233199 at *3 (C.D.Cal. Dec. 15, 2008).  With respect to the requisite

18  mental state, scienter is not required to show a violation of Rule 13b2-1.  <u>See, e.g.</u>, <u>SEC v. Retail</u>

19  <u>Pro, Inc.</u>, 673 F.Supp.2d 1108, 1142 (S.D.Cal. 2009); <u>SEC v. Softpoint, Inc.</u>, 958 F.Supp. 846,

20  865-66 (S.D.N.Y. 1997).  However, the statute's plain language requires that a defendant act

21  <u>knowingly</u> in order to prove a §13(b)(5) violation.  15 U.S.C. § 78m(b)(5); <u>see also</u> <u>Ponce v.</u>

22  <u>SEC</u>, 345 F.3d 722, 737 n.10 (9th Cir. 2003).  Evidence that a person misled company auditors

23

24

1     can support a claim that the person knowingly circumvented a company's system of internal

2     accounting controls.  See SEC v. Retail Pro, Inc., 673 F.Supp.2d 1108 (S.D.Cal. 2009).

3           Here, there is an issue of fact as to whether Fuhlendorf had the requisite mental state to

4     violate either of the books and records claims. As discussed above, a reasonable jury could find

5     Fuhlendorf knew the transactions in dispute were subject to contingencies and, therefore, knew

6     revenue was being recognized in violation of internal accounting procedures.  Cf. SEC v.

7     Shapiro, 2008 WL 819945, at *6 (E.D.Tex., Mar. 5, 2008) ("[A]llegations that [defendant]

8     misled the accountants or auditors about the existence of side agreements sufficiently supports

9     the claim that he knowingly circumvented [the company's] system of internal accounting

10     controls....").

11           Since Fuhendorf's scienter remains in dispute and no materiality requirement bars the

12     claims, the Court DENIES Fuhelndorf's motion for summary judgment as to § 13(b)(5) and Rule

13     13b2-1 with respect to all five transactions.

14        5.  Ninth Claim

15           The SEC's ninth claim is under Rule 13a-14 of the Exchange Act, which provides: "Each

16     report . . . filed on Form 10-Q [or] Form 10-K . . . under § 13(a) of the Act . . . must include

17     certifications. . . . Each principal executive and principal financial officer of the issuer . . . must

18     sign a certification."  17 C.F.R. § 240.13a-14(a).  While some courts have held there is no private

19     right of action under Rule 13a-14, the Court finds, at the least, the SEC is authorized to bring a

20     claim to enforce its rules under 15 U.S.C. § 78u(d)(1).  See SEC v. Brown, 740 F.Supp.2d 148,

21     165 (D.D.C. 2010).

22           Here, Fuhlendorf certified that "based on [his] knowledge," Isilon's Form 10K for 2006

23     and Form 10-Q Quarterly Report for the first and second quarters of 2007 did not contain any

24

1  untrue statement of a material fact or omit to state a material fact necessary in order to make the

2  statements made not misleading and that the filings fairly present Isilon's financial condition and

3  results of operations.  (Brooks Decl., Ex. 302, 657, and 658.).  While Fuhlendorf suggests the

4  language of the certification requires he have acted knowingly, a dispute remains as to the extent

5  of Fuhlendorf's knowledge of the various contingencies.  For the reasons discussed above, there

6  is an issue of fact as to whether Fuhlendorf's certifications were false "[b]ased on [his]

7  knowledge."

8       The Court DENIES Fuhlendorf's motion for summary judgment as to the Rule 13a-14

9  claim.

10   6.   <u>Tenth Claim</u>

11       The SEC's tenth claim is for violations of Rule 13b2-2, which provides "No director or

12  officer of an issuer shall, directly or indirectly . . . make or cause to be made a materially false or

13  misleading statement to an accountant in connection with . . . [a]ny audit, review or examination

14  of the financial statements of the issuer." 17 C.F.R. §240.13b2-2.

15       Here, Fuhlendorf represented to Isilon's auditor, PriceWaterhouseCooper ("PWC") that,

16  "to the best of [his] knowledge and belief," all material information regarding Islon's financials

17  had been provided. (Brooks Decl., Exs. 687, 691, 692.)  While Fuhlendorf again suggests

18  liability only attaches if he knew the falsity of his statements, there is an issue of fact as to

19  whether Fuhelendorf knew about the contingencies and, therefore, whether he knew his

20  statements were false.

21       For those transactions deemed material, the Court DENIES Fuhlendorf's motion for

22  summary judgment as to the Rule 13b2-2 claim.

23  \\

24

B. <u>Motions to Strike</u>

   1.  <u>Fuhlendorf's Motions to Strike</u>

      In his reply, Fuhlendorf requests the Court strike "Deposition Exhibit 666," which is a transcript of the SEC's interview with Talon CEO Thomas Shearer. (Dkt. No. 164 at 5)  The SEC filed a surreply in response to the motion to strike, (Dkt. No. 167), which Fuhlendorf requests the Court strike as a violation of Local Rule 7(g). (Dkt. No. 169.)

      Ex parte affidavits are always admissible for summary judgment purposes as long as the testimony is of a type that would be admissible if the swearing witness testified at a trial on the matter.  Fed.R.Civ.P. 56(e) (providing that affidavits must "set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"); <u>see also</u> <u>SEC v. American Commodity Exch.</u>, 546 F.2d 1361, 1369 (10th Cir. 1976)(allowing use of investigative statements at the summary judgment stage).  Here, Shearer was told and acknowledged that, "[i]t is a federal crime to knowingly provide false information to a federal official." (Brooks Decl., Ex. 666 at 2.)  This is sufficient for the Court to consider the investigative testimony to be admissible for summary judgment purposes even if its form is ultimately inadmissible at trial.  The Court DENIES Fuhlendorf's request to strike Deposition Exhibit 666.

      With respect to the SEC's surreply, Local Rule 7(g) allows surreplies only for requests to strike material attached to a reply brief.  Since SEC's surreply is opposing a motion to strike and not seeking to strike material contained in Fuhlendorf's reply, the Court GRANTS Fuhlendorf's motion to strike the SEC's surreply.

\\

\\

1      2.  <u>SEC's Motion to Strike</u>

2          In its response, the SEC requests the Court strike portions of Robbs's forty-six page

3  Declaration that attest to facts of which the declarant lacks personal knowledge or which

4  Defendant's motion for summary judgment does not rely on.  (Dkt. No. 144 at 24.)  Robbs's

5  Declaration identifies each of the 163 attached exhibits and provides a lengthy explanation of

6  their significance.  The SEC provides a proposal regarding the portions of Robbs' Declaration

7  that should be stricken. (O'Callaghan Decl., Dkt. No. 159, Ex. 1.)  While Fuhlendorf argues

8  Robbs "merely set[s] [sic] forth a description of the documents and testimony attached," many of

9  the explanations contain statements in which Robb summarizes the contents of the exhibits.

10  Since Robbs is a lawyer for Fuhlendorf and has no personal knowledge of the contents, the Court

11  GRANTS the SEC's request to strike portions of Robbs's Declaration as submitted.

12                                          **Conclusion**

13          The Court DENIES Defendant's motion for summary judgment because a factual dispute

14  remains as to scienter and materiality.  The Court DENIES Defendant's motion to strike

15  Deposition 666, GRANTS Defendant's motion to strike the SEC's improperly filed surreply, and

16  GRANTS the SEC's motion to strike portions of Robbs's Declaration.

17          The clerk is ordered to provide copies of this order to all counsel.

18          Dated this 17th day of March, 2011.

19

20

21

22                                          Marsha J. Pechman
                                            United States District Judge

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24